Irving H. Saypol, J.
The Attorney-General, on leave granted, ■sues to forfeit the corporate charters of Abbott Maintenance Corp. and Instalment Department, Inc. On Instalment’s appeal, in reversing orders denying the motion to vacate the temporary injunction obtained by the plaintiff and granting his cross *1020 motion appointing the receiver, in vacating the injunction and denying the receivership, the Appellate Division said in its memorandum: “ Plaintiff’s supporting papers are insufficient with respect to defendant-appellant Instalment Department, Inc. They do not show that such defendant-appellant had more than a general knowledge of the nature of the business conducted by Abbott Maintenance Corp. Nor is it sufficient merely to state the conclusions of the investigators, even as to the activities of Abbott Maintenance Corp.” (9 A D 2d 757.)
The plaintiff’s evidence as to Instalment amounts to no more than was found by the Appellate Division. At most, its relationship was that of purchaser, as part of its authorized corporate powers, of some of the codefendant Abbott’s financial paper, a small fraction of its other business as a dealer in financial paper. It had no dealings with those with whom Abbott dealt directly other than to buy from Abbott at a discount and then to collect for itself the financial installment obligations which Abbott secured in its business. It had no part in any of Abbott’s solicitations or representations or in misrepresentations.
The evidence in the light most favorable to the plaintiff as to Abbott shows that Abbott was incorporated to own, control, distribute, sell or otherwise dispose of merchandise, franchises and services. Its principals contrived a plan, not novel, to afford to householders and store owners floor waxing, rug and upholstery cleaning and window washing. Customers were solicited over the telephone. Those who wanted such services were parcelled out to employees or independent contractors and the latter are the ones who are claimed to have been defrauded so as to constitute a misuser of Abbott’s charter — its contract with the State of New York.
Sixteen men testified that they came to Abbott, all but one lured by a plainly false newspaper advertisement in the Help Wanted sections, offering part-time jobs at $4 to $6 an hour with free training, requiring no investment. Instead, after various talks with Abbott’s people, they signed agreements either as contractors or employees, under which they were supplied with new electric floor-waxing machines and accessories, selling for about $127, a uniform coat, rug-cleaning devices, brushes, advertising circulars, et cetera.
They were then set up in their independent businesses with work to be supplied by 10 of Abbott’s prospects. For this, these applicants, by promissory notes, conditional sales agreements and wage assignments, obligated themselves to pay about $1,000 in monthly installments over a two-year period. *1021 Of the 16 who so fell in, some never got beyond signing the papers. Others obtained the machine and paraphernalia, but never worked. Some kept the machine, others returned it. Some were sued, others paid or are paying, and at least two went into business and had considerable operations in their own rights.
Under the scheme, what they collected from their customers was theirs. Abbott mostly paid nothing.
The action historically stems from the ancient quo warranto proceeding, now covered by article 75 of the Civil Practice Act, see sections 1208 and 1217. In a note to the case of People v. Rensselaer & Saratoga R. R. Co., (30 Am. Dec. 33, 45) the author, Mr. Freeman, is quoted in State v. Standard Oil Co. of Kentucky (120 Tenn. 86, 117-119) as follows: “ ‘ The writ of quo warranto, having its origin at some unascertained period early in the history of the common law, was a high prerogative writ, in the nature of a writ of right, for the king against one who usurped or claimed any office, franchise, or liberty of the crown, to inquire by what authority he supported his claim, in order to determine the right. It also issued in cases of the misuser or nonuser of a franchise, commanding the respondent to show by what right — quo warranto — he exercised the franchise, having never had any grant of it, or having forfeited it by neglect or abuse. 3 Black., Com., 262-264; High on Extr. Bern., section 592. If the respondent could not establish his right, the franchise or office, as it might be, was forfeited to the crown. As many of the charters under which the franchises were claimed had been destroyed in the numerous insurrections under which the country suffered, or had been otherwise lost, sufficient authority for the exercise of the royal grants could not, in very many instances, be shown; and the crown became enriched at the expense of its subjects. The writ was especially calculated to subserve the purposes of a grasping monarch, as the right of the respondent to his office, liberty, or franchise was heard before commissioners of the king’s own appointing. To correct the abuse of the royal prerogative, and to afford some opportunity for a fair and convenient hearing, the statutes of Gloucester (St. 6 Edw. I, c. 1278) and de quo warranto novum (St. 18 Edw. I, c. 1290) were passed. These statutes secured the right of a trial before the justices on their circuits, and confirmed those franchises resting in prescription, or claimed under charters granted within the time of Biehard I, or granted prior thereto but since allowed.’
“ ‘ This writ was of a civil nature, forfeiting or annulling some franchise, or ousting the respondent from its exercise; and, *1022 being a writ of right, it was conclusive upon the crown. These features of the proceeding, together with the reason that, with the discontinuance of justices in eyre (2 Coke, Inst. 498), St. 18 Edw. I, lost its efficacy, led to the introduction of the speedier remedy, and one not so binding upon the crown, of informations in the nature of quo warranto. This remedy was criminal in its nature, and not only forfeited the usurped or misused franchise to the crown, but' also punished the usurper. Like the original writ of quo warranto, the precise date of the appearance of this information is unknown. It grew up side by side with the older writ, and gradually supplanted it. It was a criminal proceeding, and warranted the imposition of a fine for the usurping of the king’s liberties; but the fine fell to a nominal amount, and the information existed merely as substitution for the original quo warranto. Thus far the contest in respect to a given franchise was carried on under the writ of quo warranto, or information in the nature thereof, between the crown and its subjects only. The province of the information was, however, greatly enlarged by St. 9 Anne, 20, in the year 1711, which gave to private individuals the power of proceeding thereunder against any one who had unlawfully usurped or intruded into any office or franchise. This act, one of vast importance, is preserved in substance in the majority of the States of the Union.’ ”
It comes down to us today progressively, through the Field Code in 1848, around section 400, in the Code of Civil Procedure, around section 1798, and finally it is to be found now in article 8 of the General Corporation Law, of which section 91 permits the Attorney-General, on leave of court, to sue for the annulment of a corporate charter on five grounds, of which only the second is here pertinent.
Subdivision 2 reads: [A corporation which has] “ [v]iolated any provision of law whereby it hás forfeited its charter, or by the abuse of its powers has become liable to be dissolved ”.
There is no evidence that Abbott violated subdivision 1, viz.: offended against any provision of any act, by or under which it was created, etc. Concededly, subdivision 3 is inapplicable. Nor is there evidence, despite the plaintiff’s contention, that it has acted ultra vires, beyond its powers as provided in subdivision 5. Subdivision 4 applies to commission or omission of an act which amounts to a surrender of its corporate rights, privileges, and franchises — an abandonment, as I understand it, of which there is no evidence here.
The essential position of the plaintiff is that Abbott’s charter should be forfeited for fraud against the public and for vio *1023 lation. of various statutes; (General Business Law, § 396■— advertising the offer for sale of goods, with the intent not to sell for the price stated or not at all; Personal Property Law [Retail Instalment Sales Act], art. 10, §§ 401, 403, subcl. 3, which, excluding things sold to commercial or business use, restricts remedies, defenses as to third parties, and other practices in the use of installment contracts and obligations, but which expressly provides that, although prohibited provisions in such agreements shall he void, nevertheless the validity of the contract or obligation should not be affected).
It is a question of whether or not the deceptive advertising, as the lure for the prospects who thereafter committed themselves in writing to a different arrangement and obligation, constitutes fraud. And if so, whether that is an offense warranting capital punishment as to the corporation (People v. Williamsburgh Turnpike Rd. & Bridge Co., 47 N. Y. 586, 596). Accepting Abbott’s conduct as fraudulent, is it so damaging to the public as to warrant corporate forfeiture or is it rather of a private character for litigation between the parties affected?
Section 134 of the General Corporation Law authorizes the Attorney-General, in his exclusive discretion, to proceed where he believes that the public interests require, to bring action under section 91 of the General Corporation Law, by leave of court, as he has done here. But a jury verdict of forfeiture could not be sustained without a finding of fact in the verdict that the extent or degree of the offense is such as ought subject the corporation to execution, rather than to leave those affected or injured to the usual remedies (People v. Williamsburgh Turnpike Rd. & Bridge Co., supra).
A judgment of ouster is well founded only upon a finding of fact of not merely the breach of the letter of a condition subsequent, but of its, intent and meaning, and must amount to a substantial breach of the condition (Thompson v. People, 23 Wend. 537, 540, 582-585).
In People v. North Riv. Sugar Refining Co. (121 N. Y. 582, 609) in an unanimous opinion, the Court of Appeals held: “ [T]he State does, not concern itself with the quarrels of private litigants. It furnishes for them sufficient courts and remedies, but intervenes as a party only where some public interest requires its action. Corporations may, and often do, exceed their authority where only private rights are affected. When these are adjusted, all mischief ends and all harm is averted. But where the transgression has a wider scope and threatens the welfare of the people, they may summon the offender to *1024 answer for the abuse of its franchise or the violation of its corporate duty.”
In State ex rel. Crossland v. Omaha & Council Bluffs Ry. & Bridge Co. (91 Iowa 517, 526-527) it was held as follows: “ A failure to perform obligations to individuals or to other corporations is not ground of forfeiture, for the state does not concern itself with the quarrels of private litigants. 1 Beach, Priv. Gorp., section 8.”
In Corpus Juris Secundum (vol. 19, § 1663, Misuser of Franchise or Powers, Public Interest Involved, pp. 1435-1436) it is said: “ The misuser must inflict injury on the public generally * * * It is not necessary to prove actual injury to the public; if the inevitable tendency of the act is injurious to the public a sufficient ground of forfeiture exists. Wherever the transgression of a corporation threatens the welfare of the people, they may summon the offender to answer for the abuse of its franchise or the violation of its corporate duty. ’ ’
Fletcher, Cyclopedia Corporations, (vol. 16 [1942 rev. vol.], § 8036, pp. 756-757) says: “ And a failure to perform obligations to individuals or to other corporations is not ground of forfeiture, since the state does not concern itself with the quarrels of private litigants.”
In the note by Rosenzweig (13 Cornell L. Q. 92, Corporations: Quo Warranto: Forfeiture of Franchise on account of Crime) he says at page 93: “ Usually, however, the courts will be loath to grant the extraordinary relief afforded by quo tvarranto save where the ultar vires acts, as such, endanger the interests of the people, or where there has been a radical departure from the spirit of the charter. In every case, the court will balance conveniences to see whether it should grant this extraordinary remedy. Like the injunction or the mandamus, it is a remedy which the court in the exercise of its sound discretion may refuse even though the technical requirements for allowing it may be present.”'
Beach, Private Corporations (vol. 1 [1891 ed.], § 58, A.ctual or Prospective Injury to the Public to be Proven) says at pages 116-118: “Something more than non-user, accidental negligence, excess of corporate powers or mistake in the mode of exercising an acknowledged power, is requisite to constitute a cause of forfeiture. There must be some "wilful or improper act or neglect, such as to work or threaten a substantial injury to the public; or actual inability to perform some corporate obligation, or an entire non-user of its powers and privileges for such a time as to create a presumption of surrender. The transgression must not be merely forma] or incidental, but *1025 material and serious, and such as to harm or menace the public welfare. For the State does not concern itself with the quarrels of private litigants. It furnishes for them sufficient courts and remedies, but intervenes as a party only where some public interest requires its action. Corporations may and often do exceed their authority where only private rights are affected. When these are adjusted all mischief ends and all harm is averted. But where the transgression has a wider scope, and threatens the welfare of the people, they may summon the offender to answer for the abuse of its franchise or the violation of its corporate duty.”
In the light of-what has just been said, the cases cited by the plaintiff, like People v. National Cancer Hosp. (200 Misc. 363), (temporary injunction on a showing of fraudulently collecting $542,000 in charitable contributions from the public generally and refusing to account when only $100,000 was left and where there was no hospital), or People v. Volunteer Rescue Army (262 App. Div. 237) (sustaining a complaint under preliminary attack showing internal mismanagement and misappropriation and a fraudulent form of solicitation of moneys from the general public for charitable purposes), or People v. Borg-Johnson (11 Misc 2d 928) (a motion dealing with a temporary injunction, in an action based on fraudulent advertising of miniature radios for sale to the public generally), are not dispositive.
These are all intermediate applications which are not helpful on the ultimate question here. The instances shown are plainly misdeeds against the general public, and, moreover, they do not concern questions of sufficiency of evidence at trial warranting forfeiture of the charter. They do not settle anything finally, but they all deal with conduct directed at the public generally.
What was said in People v. Albany & Susquehanna R. R. Co., (57 N. Y. 161, 167) is apt here: ” The people of this State have no general power to invoke the action of the courts of justice, by suits in their name of sovereignty for the redress of civil wrongs, sustained by some citizens at the hands of others. When they come into court as plaintiffs in a civil action they must come upon their own right, for relief to which they are themselves entitled. It is not sufficient for the people to show that wrong has been done to some one; the wrong must appear to be done to the people, in order to support an action by the people for its redress. The suit now before us, seems to have been instituted on a different theory. It sets forth various acts as wrongful, which, if wrongful, affect no public right, These wrongs are wrongs to individual citizens and *1026 not to the State, and are remediable at the suit of the parties injured only.”
The grounds put forward to sustain the plaintiff’s claim for relief cannot be upheld. There was a complete lack of right in the People in reference to the litigation. Parties are their own judges as to what suits they will institute and their suits arc to be disposed of on their own merits. The People cannot intervene except upon the assertion of a distinct right on the part of the public in respect to the subject matter litigated.
The action against Instalment Department, Inc., is dismissed for want of any evidence to support the allegations of the' complaint.
The action against Abbott Maintenance Corp. is dismissed on the ground that frauds, as may have been shown, are those to be redressed in litigation, in lawsuits between the affected parties. There is no basis here, in the absence of a showing of wrong to the public generally, for a finding to support the forfeiture of the charter of Abbott.
Motions are accordingly granted with an exception to the plaintiff.